Good morning. Good morning, Your Honor. Good morning. I'm Alphonse Irwin, appearing on behalf of Commercial Law Corporation. This appeal is based on a claim for attorney's fees from a failed bank. My law firm represented that bank for several years. The case primarily resolves, although I raised several issues in my principal brief, the case resolves around the application of federal statutes, specifically 12 U.S.C. 1821 D-9A and 12 U.S.C. 1823 E-1. Our position in our brief and what we have taken is that they do not apply to contracts of services, particularly for services of an attorney. The FDIC has taken a position that the statutes apply primarily to all types of contracts. This Court, in 1991... I wonder if they feel that way about the contract for the landscape maintenance outside the bank. From what I've seen, Your Honor, I think they apply it to everything. That's what I'm wondering. Maybe that question is not obvious. There was a gentleman who provided computer services to the bank. Did they refuse that? Yes. He couldn't file a claim. They said if it wasn't in writing, he couldn't file a claim. So his claim didn't even get a chance to file. In your case? In my case? In this case? Yes. FDIC. Okay. Yes. We're looking for . . . I guess I am looking for your authority for non-traditional banking kinds of contracts being treated as falling within the confines of this statute. Well, Your Honor, I did cite to several other cases and other circuits that looked at that matter and said that it didn't apply. Specifically, I looked at and I did cite . . . It didn't apply. Right. Yes. And I think in this case, and if you look at just the language, if you go back and you look at the application specifically, even going back to the . . . I think it was Langsley, it's always been brought up in a banking transaction. It always looks at the assets, the diminution of the value of the assets. In all those cases that it has been enforced, it's always been some type of oil promise that was there where the bank held a note or some type of document that it was trying to enforce. This court in Aetna, it was FDIC Aetna, this court took the position that it did not apply to bonds. That was in 947 FedSec 196. In my matter, or in this case, it never applied. And I think more so it goes to the issue of the contract for services was an old contract. This case resolved around the exclusion of a retainer agreement that was executed in 1989. Also, an affidavit was provided. And the reason for that . . . the exclusion of the retainer agreement was that it said that this was not produced in time and it was contrary to a position that was taken prior. Likewise, with the affidavit, it said that the testimony and affidavit was contrary to an old agreement. I briefed those issues and I think I covered and felt that the lower court made an error. I believe that this case, that there were factual issues, that this case should not have been decided on a motion for a summary judgment, and that the court was wrong in its application. If you're correct and you convince this court that the disclosure requirements are inapplicable to other than non-traditional banking kinds of events, you're seeking a remand. And in the remand, the court's going to be looking carefully at some evidence of backdating of those documents between the bank president and you and your firm. Well, I find that ironic, Your Honor, because first of all, the only one that was accused of any backdating was counsel. Prior to the filing for the motion for summary judgment, FDIC counsel filed a grievance, which is still outstanding. Just prior to filing the response for summary judgment, the court allowed . . . This all will be on the table. Yes, I understand. When you go back. But, Your Honor, this case, the lower court has allowed FDIC to take mirror images of my computers in my office. They went back three years. The report came back. Everything that was disclosed earlier was there. They also went back after discovery had ended and asked for another subpoena . . . Which goes back that you're ready for that. Yes. Yes, sure. Okay. Well, I was going to ask you if you . . . sort of a follow-up question. If you're successful in getting the judgment reversed and remanded, what issues are still alive when you get back down there? I mean, there are a bunch of issues that are . . . Your Honor, we've had depositions taken. I've given affidavits. There was an issue regarding the amount of the fees. I've given affidavits from other parties indicating the amount of the fees, and that were outstanding. The other issue probably would be, as was pointed out, the security interest. That's been an issue that has been raised several times. There has been discovery primarily based upon that. There's been an attack on my character regarding the backdating of these documents, but there's never been any proof. There was reports that were provided, and still there was no proof. So that's probably going to be the primary issue, just the security agreements that are out there. But of the claims that you raised on appeal, those would be the ones that were still alive? Well, I think if primarily the one claim that seems to be attracting the most attention is the claim for security interest, I believe that they revolve around security. I don't think . . . I mean, I would have some concern about the way that this case was handled in the lower court, some of the things that were allowed. So I do have a problem with the bias, although I know that that's a secondary issue in this matter. Okay. I think you've answered my question. Thank you. May it please the Court, Jerome Madden, FDIC as receiver for Home Federal Savings Bank. Your Honor, this case is a little bit unusual. The claim that was filed sought $176,000 in legal fees without any documentation whatsoever about it. He was asked to file supplementary information showing some basis for the attorney's claim charge. Are you talking about what work was done and so forth? Right, Your Honor. There was no itemization or dates or anything. Just, you know, it's $176,000. We have an obligation to maximize assets, minimize losses. We asked for more information. We didn't get anything any different than we got the first time. So it was not proven to the satisfaction of the receiver and was denied. And, of course, you know, commercial law filed its suit as it's entitled to do. When it filed its suit, for the first time there was an allegation that the bank had agreed to allow liens to be placed on the bank's two branches. That was the first time it was raised with us. And that's a whole different issue for the FDIC because, you know, that implicates an asset of the FDIC. And so that really got our attention. It also, if allowed to be enforced, enables commercial law to jump the line ahead of all other creditors, unsecured creditors, because they would be paid dollar for dollar instead of on a pro rata basis. So this is a classic DENCH case. It does affect the interest of the FDIC in an asset. As the court knows in First State Bank of Wayne County, the court applied DENCH in a non-asset scenario. And this is an asset scenario. And so there should be no issue about whether DENCH applies to bar this claim. But the FDIC in 1997 issued a policy statement whereby we agreed that we would not raise DENCH because in Feria 1989, Congress gave us 1821 D9A, which basically said you can't rely on an unrecorded agreement to be the basis of an affirmative claim against the FDIC unless the agreement meets the requirements of 1821E, which is the codification of the DENCH doctrine. But doesn't that normally apply to secret loans or something of that nature and not agreements for service? I mean, I was being a little facetious when I said the landscape, the grass mower. But this is more like the grass mower in my mind, and it is like, well, we'll loan you this amount of money, and we're, say, going to put a pretty high interest rate on it. But it's just between us because if it ever came to light, it would really hurt us. And let's just keep it on the QT. Well, you're right. And if you look at our policy statement, we do address that almost. It may be the exact example that is discussed is 1821 D9A. Now, does your policy statement – I'm sorry, I should let you finish the answer. Go ahead, please. The policy statement itself identifies those kinds of situations where it says we will not raise 1821 D9A in those circumstances, but the counsel in the field is to contact headquarters and see whether this is a special circumstance because we did reserve the right, if the policies are implicated, that even those sorts of cases to do it. And so, yes, we're very sensitive to that. The breadth of D9A could cover it, but we don't typically do it. In this case, the difference is that he has a lien for payment of these services on the bank's assets, and that makes it a classic dench case. The evidence is overwhelming. There was a lot of, let's say, moving target about what exactly the agreement was based on. The district court was very concerned about that. So we thought this was a case where we should assert 1821 D9A. And that's what – I wanted to clarify that. That is how you argued this to the district court, that the lien on the bank's real estate took this out of a services contract. Yes, it makes it a classic dench case, Your Honor. It makes it a classic case. Well, it's not classic, is it? I mean, dench had to do with traditional banking. It was a bond. It wasn't classic. This is not classic. It's legal fees for Pete's sake. Right. The dench case itself was a classic bank loan case. Right. But dench has been applied not only defensively when we're trying to recover and somebody has an unrecorded agreement. You're trying to recover under a services contract. We're not trying to recover. We're trying to bar a claim that's unrecorded that affects an asset of the FDIC. Okay, but the fact that the claim is for legal services as opposed to an undisclosed loan, a side deal on a loan, it's legal services. So I'm still looking for how you or what's your best case that would permit a reading of the statute as codified about the dench doctrine to include, and I'll say landscaping. How do you get it out of the landscaping? It's legal services. It's non-traditional banking. It's not loans. Now, I'm wondering if the asset, the lien on the real estate, is your grounds for taking it out of the traditional. That was, as I said, it wasn't proven to our satisfaction. Then when they filed the complaint, all of a sudden there's a declaration that the bank agreed to put liens on the assets of the bank. We'd already resolved the bank's. All of a sudden means that wasn't the grounds you started with. No. The grounds we started with wasn't proven to our satisfaction. It was a blanket. We want $100,000, so we denied it. Then when the complaint was filed, we wanted him to prove his claim. He couldn't prove his claim in the administrative process. He said go to court. He's claimed for? $176,000 in attorney's fees. Legal services. Yes. That's right, Your Honor. But if you look at our policy statement, we actually address attorneys providing services for the bank. We say typically we would not assert these protections in those kind of cases unless the policy statement, policies underlying dench in H.23E and D-9A are implicated. Your policy statement is arguably self-serving. What legal effect do we give to the policy statement? Only skid more respect, Your Honor. Right. Okay. But even that statement, I'm looking at that. I'll think about that a little more. Right. Dench and the progeny of dench, H.23E, is not just about the FDIC trying to recover on a loan and somebody is in a recorded agreement. It's about net worth. And if you look at dench itself, it gave you two policies. One, you can't misrepresent its security to the FDIC. And the second one was, look, anybody that can prove to the FDIC that they're solvent can get deposit insurance. You can't mislead the FDIC. It's all about net worth and all due respect. Assets you can't recover on affect the net worth. Liabilities you don't know about affect the net worth. This is a small bank. They told the OTS, they were in trouble condition, told the OTS our law firm will not bill us anymore. That's what they told the OTS. That's what we had. And so they're trying to raise capital. At the same time, they're actually hiding liabilities. All right? The provision upon which you rely requires a contemporaneous writing executed at the time the bank acquires the asset. Right? When you view this in context, that has to correlate to something that happens as the bank is acquiring an asset. 1823 definitely talks about an asset. There's no question about it. Well, I mean, we know exactly how it says. It has to be at the time the bank's acquisition of the specific asset. That's with respect to assets. What part do you rely on? We shouldn't read that? Yes, Your Honor. Here's how it works in our view. We've been administering this statute for 70 years, and this is how we see it. 1823E talks about an asset. Okay? It also codified DENCH. After it codified DENCH, DENCH became applicable to non-asset cases. It became applicable to offensive use of unrecorded agreements, as well as defensive. And Congress codified DENCH in 1950 in 1823E. In 1989, it codified the expansion of DENCH to cover non-asset cases. How about address, if you would, please, the Fifth Circuit, Thigpen v. Sparks? Yes, Your Honor. Didn't the Fifth Circuit reject your broad reading of this disclosure requirement? Yes, in all due respect. Well, in all due respect, Your Honor, we think Thigpen is wrong. We think the right analysis is in Motor City in the Eleventh Circuit. It's an en banc decision, I think 1997. Since that's been handed down, no circuit court has held in accordance with Thigpen. And Thigpen says it's very interesting. He says, well, Congress didn't want to plow new ground to make new substantive law when it enacted D-9A in 1989. But it doesn't. That's our point. DENCH had been expanded from the time in 1942 to reach to non-assets to offensive use. And Congress, just like it did in 1950, codified the evolving DENCH. So D-9A says no claim against the FDIC based on an unrecorded agreement is valid unless it meets the requirements of 1823E. In our view, the fact that it's an asset is not a requirement of 1823E. It's the recording requirements, which are in writing, contemporaneous, approved by the Board of Directors, held as an official record of the bank. That's what DENCH would do itself. But your policy statement talks about DENCH shall not be used as a defense against claims by vendors who have supplied goods or services to failed institutions. Typically. Typically will not be unless the policy is implicated and counsel in the field contacts designated people in Washington. Where's that all said here? Where's that said in the statement, the policy statement? It's in there, Donna. It says typically we will not assert it against vendors. Counsel is to contact counsel in the FDIC. It talks about some things that need Washington approval. Right. And this is one of them. It doesn't say we'll never do it. It says unless the policy is implicated. And this is one of those cases where it's implicated. So I think Ben's just wrong to say that. Do you have a case that's right? What case do you point us to that is right? Motor City, Your Honor. Motor City. Motor City in the 11th Circuit is an en banc. It did not specifically reach D-9A to be fixed. No, it did not. But it is an excellent example of the breadth of DENCH. And it's the reason why what Congress had in mind. If D-9A does not mean what the FDIC thinks it means, it means nothing. Because 1823 already covers assets. It covers assets whether it's offensive or defensive. And so if D-9A doesn't apply to non-asset cases, it means absolutely nothing. That's our first principle. Really? It means absolutely nothing about the landscaper? Don't we get absurd results if we say it applies to everything? Yes, we could, but we don't. We're not a rogue agency. We have a policy statement. We're very frank about it. We don't raise it in a normal case. Is your argument the trust me argument? Trust us? Trust our? Your Honor, we are in the courts all the time. And you can look at our record, and it's not there. You're not going to find landscape cases. There are none. This is a very unique case. It's not just any vendor. This is an institution-affiliated party. And in FERIA, Congress recognized the importance of attorneys, appraisers, and accountants in the business of banking. They are critical for the bank. The bank cannot operate. In some ways, they're more important than a lot of the employees at a bank. And so they are very carefully, heavily regulated. And so this is an IAP. This makes this different than cutting the grass. I didn't know what IAP was. I'm sorry, institution-affiliated party. In FERIA, Section 1818 of Title 12 is the enforcement action of the agencies against officers, directors, agents, shareholders for misconduct. And in FERIA, Congress expanded that to cover attorneys, accountants, and appraisers of banks. They're in the same category, just as if they were employed by the bank. And so that's a big distinction between cutting the grass and here. One of the things Congress recognized was how important these professionals are in running the bank. And this, as the Court said, this is a poster child for the policies of DENCH. And so we'd ask that the Court affirm this report. If there's no further questions. You would like us to rely on the common law of DENCH rather than the language of the statute? Thank you for asking that question. Well, in our policy statement, we said we would not rely on DENCH, but that was with the understanding that we wanted the courts to interpret D-980 the way we did. But if you're not going to do that, of course, under the First Bank of Wayne County, DENCH still lives in this court unless you were to find out it was preempted. It would be overruling the Supreme Court, contrary to Motor City. Langley? The Court spoke in Langley? Is that the case here? No, this court in First Bank of Wayne County. I know that you're talking about that, but then you said the Supreme Court. Yes, you would have to go against First Bank of Wayne County. You'd have to overrule DENCH, which is a Supreme Court case, of course, 1942. And this court hasn't done that. The Eleventh Circuit hasn't done that, and we think it's correctly decided. But we don't rely on DENCH, but if the court doesn't think we're right about the statutory interpretation, then, of course, DENCH applies. Thank you. Thank you, Your Honor. I would like to just get some clarification on the facts represented by counsel. First of all, there was two breakdowns. There was an invoice provided to FDIC and the administrative process. That invoice came back. They requested detail on the amount of hours. I think our issue today is way beyond the bills and the who shot John with respect to that. We're really looking at the statute and whether it applies to the foreclosure claim and the doctrine. One of the things that the counsel didn't mention is that in the policy statement itself, it addresses vendors or services, but it also says that you go look for evidence that those services were provided. In this matter, what I argued is that we represented this bank for over 25 years. Home Federal was a mutual bank. Being a mutual bank, it could not sell shares of stock. It had to go out and have account holders. Because of its unique formulation, we tried to set up a subsidiary. It was a stock company, so we could raise capital. The district court here just held that because you haven't complied with the disclosure requirements, you're out of luck. We're looking to see whether those disclosure requirements are an appropriate rationale. The disclosure requirement was basically a written retainer agreement. This written retainer agreement, even under their own policy statements, it allows for services provided. It's something similar to the statute of frauds, but there's a performance, so you still look beyond it. This agreement was almost 25 years old. As I stated in my briefs, there was depositions, intensive depositions regarding the retainer agreement. There was nothing different in the retainer agreement that they had enlisted it. It was just a standard retainer agreement. That was the basis. A retainer agreement doesn't list fees due. That's where the trouble comes in. You have a big bill. It does list fees due, correct. And I was asked what were those. 25 years ago or recent? No, 25 years ago. That did have a provision in there regarding fees. I was also questioned on, I'm sorry. We understand that the real issue today is how many dollars you're owed, not whether or not you have an agreement to be paid at least for 25 years. And what I spoke to was that I was asked about the progression of the billing rate. That billing rate had progressed over 25 years. I also was asked to give more detail on the work that was provided at that billing rate and how you came up with that figure. That was given after submission of the claim to FDIC administrative. It was also provided in discovery. I was also questioned extensively in the deposition regarding the same thing. But I believe that the court's position has always been you didn't have this in writing. It was an oral agreement. And my position was, well, it was. Initially they wanted to see the different invoices that were provided. Those were provided. I indicated that the rate was changed based upon a notation at the bottom of an invoice, that the rate will be going to this. The rate hadn't changed, I believe, in roughly 10 years. It had always been at that particular rate. So the writing that they asked for was provided. Our position was that this provision shouldn't apply at all. An asset under DENCH or under 1823 refers to the bank's portfolio of loans and securities. It doesn't go toward that. The analysis that was talked about in lending was that FDIC needs to come in very quickly, do an analysis, and see what the values of the bank's assets. They don't come in and look at the building and say how much is this building worth and what can we sell it for, because that's not what they're trying to do. Their process has always been to have a receiver appointed, and then that receiver generally within a day or less than a day sells to FDIC corporate. So they analyze assets and liabilities. What is the loan portfolio, how much do you have, and the liabilities are, what are the demand deposits that you have? Those are our liabilities. And then we're balancing between the two. In the case of Home Federal, there was no money spent by FDIC on liabilities that were outstanding. This bank got into problems because of an accounting irregularity. What happened with this bank was that they had a portfolio that was performing very well. OTS came in and said your liquidity ratio is low. They did have a line of credit with, I think, the Federal Home Loan Bank, and they could have borrowed for the liquidity. That was the issue that I raised initially is that, well, they said, no, they should sell these securities that they have. And selling those securities, what happens is that they had to change the method of accounting. They had to go from cost to fair market value, and at the time the market was low. So that brought the capital ratio down. That's how they got into trouble. And so after that, we were scrambling, trying to find a way to raise capital. So when we spoke to investors, the only way that, first of all, they wouldn't approve a subsidiary that we could bring in and actually sell stock, because we had folks who were interested in selling stock. A subsidiary, under the rules of OTS, could do the same things that the bank could do, except it couldn't accept deposits. So we could do financing with cards. We could do all different types of things. They would not approve. Although there was already a subsidiary available, they would not approve that. They said that it had to be sold out, and they wanted the management out. And that's when we started looking at other types of investors. Because that's the only way. This bank was going to have to be converted to a stock bank, and then from a stock bank, it was going to be sold. It's not a mutual bank anymore. Matter of fact, most of the mutual banks are going away. Council made reference that there hasn't been a decision after a thick pen, and I would say that John V. Resolution Trust was after a thick pen, and that was in the Seventh Circuit. It mentioned that the security interest was not recorded, and as I'd argued that this was a security interest that did not have to be recorded under the Michigan statute, it was exempt from recording. And going through this process with the administrative agency, initially my firm got a call saying that, well, you know, we're not going to accept anything at all. And so it didn't make any difference. I knew that we were not going to get anything from the administrative claim. No creditors got anything from the administrative department on this, and most of them were turned away because I worked with this bank extensively for a large number of years, and I knew the people who were going to file claims, and there are discourageable filing claims. Thank you. Thank you.